## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

AARON BROWN, individually and on behalf of all others similarly situated,

                    Plaintiff,

    v.

THE MITRE CORPORATION, THE BOARD OF TRUSTEES OF THE MITRE CORPORATION, THE INVESTMENT ADVISORY COMMITTEE OF THE MITRE CORPORATION and JOHN DOES 1-30.

                   Defendants.

CIVIL ACTION NO.:

## COMPLAINT

Plaintiff, Aaron Brown ("Plaintiff"), by and through his attorneys, on behalf of the MITRE Corporation Tax Sheltered Annuity Plan ("TSA Plan") and the Qualified Retirement Plan ("QRP Plan") with TSA and QRP being referred to collectively as the Plans,[1] themselves and all others similarly situated, state and allege as follows:

### I.    INTRODUCTION

1.    This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plans' fiduciaries, which include the MITRE Corporation ("MITRE" or "Company") and the Board of Trustees of MITRE Corporation and its members during the Class Period[2] ("Board") and

---

[1]  The Plans are legal entities that can sue and be sued.  ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plans are not a party.  Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plans and their participants.

[2] The Class Period, as will be discussed in more detail below, is defined as September 29, 2015 through the date of judgment.

the Investment Advisory Committee of the MITRE Corporation and its members during the Class Period ("Committee") for breaches of their fiduciary duties.

2.     To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries.  Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B). These twin fiduciary duties are "the highest known to the law." *Moitoso v. FMR LLC*, 451 F.Supp.3d 189, 204 (D. Mass. Mar. 27, 2020) (quoting *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 595 (8th Cir. 2009).

3.     The Department of Labor has explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, both "establish a prudent process for selecting investment options and service providers" and "monitor investment options and service providers once selected to see that they continue to be appropriate choices."  *See, "A Look at 401(k) Plan Fees*," *supra*, at n.3; *see also Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1823 (2015) (*Tibble I*) (reaffirming the ongoing fiduciary duty to monitor a plan's investment options).

4.     Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must give substantial consideration to the cost of investment options.  "Wasting beneficiaries' money is imprudent.  In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs."  Uniform Prudent Investor Act (the "UPIA"), § 7.

5.     "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'"  *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016) (*en banc*) (quoting Restatement (Third) of Trusts, § 90, cmt. b) ("*Tibble II*").[3]

---

[3] *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Aug. 2013), at 2, available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-

6.      Additional fees of only 0.18% or 0.4% can have a large effect on a participant's investment results over time because "[b]eneficiaries subject to higher fees … lose not only money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble II*, 843 F.3d at 1198 ("It is beyond dispute that the higher the fees charged to a beneficiary, the more the beneficiary's investment shrinks.").

7.       Most participants in defined contribution plans like 401(k) or 403(b) plans expect that their accounts will be their principal source of income after retirement.  Although at all times plan accounts are fully funded, that does not prevent plan participants from losing money on poor investment choices by plan sponsors and fiduciaries, whether due to poor performance, high fees or both.

8.      Prudent and impartial plan sponsors thus should be monitoring both the performance and cost of the investments selected for their retirement plans, as well as investigating alternatives in the marketplace to ensure that well-performing, low-cost investment options are being made available to plan participants.

9.      At all times during the Class Period, the QRP Plan had at least $1.6 billion dollars in assets under management.  At the end of 2020 and 2019, the QRP Plan had over $2.4 billion dollars and $2.2 billion dollars, respectively, in assets under management that were/are entrusted to the care of the Plan's fiduciaries. The December 31, 2020 Report of Independent Auditor of the MITRE Corporation Qualified Retirement Plan ("2020 QRP Auditor Report") at 8. At all times during the Class Period, the TSA Plan had at least $1.9 billion dollars in assets under management. At the end of 2020 and 2019, the TSA Plan had over $4.5 billion dollars and $4.1 billion dollars,

---

center/publications/a-look-at-401k-plan-fees.pdf (last visited February 21, 2020) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan.").

respectively, in assets under management that were/are entrusted to the care of the Plan's fiduciaries. The December 31, 2020 Report of Independent Auditor of the MITRE Corporation Tax Sheltered Annuity Plan ("2020 TSA Auditor Report") at 7.

10.     The Plans' assets under management qualifies them as jumbo plans in the defined contribution plan marketplace, and among the largest plans in the United States.  As jumbo plans, the Plans had substantial bargaining power regarding the fees and expenses that were charged against participants' investments.  Defendants, however, did not try to reduce the Plans' expenses or exercise appropriate judgment to scrutinize each investment option that was offered in the Plans to ensure they were prudent.

11.     Plaintiff alleges that during the putative Class Period Defendants, as "fiduciaries" of the Plans, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plans, to Plaintiff, and to the other participants of the Plans by, *inter alia*, failing to control the Plans' administrative and recordkeeping costs.

12.     Defendants' mismanagement of the Plans, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duty of prudence, in violation of 29 U.S.C. § 1104.  Their actions were contrary to actions of a reasonable fiduciary and cost the Plans and its participants millions of dollars.

13.     Based on this conduct, Plaintiff asserts claims against Defendants for breach of the fiduciary duty of prudence (Count One) and failure to monitor fiduciaries (Count Two).

## II.   JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq*.

15.     This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

16.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District.  Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

### III.  PARTIES

**Plaintiff**

17.      Plaintiff, Aaron Brown ("Brown"), resides in Colorado Springs, Colorado. During his employment, Plaintiff Brown participated in the Plan investing in the options offered by the Plan and paying the recordkeeping and administrative costs associated with his Plan account. Mr. Brown invested in the QRP Plan, but both Plans are managed in an identical fashion, have identical managers and have identical Trustees. In fact, MITRE itself portrays both Plans as being a single plan in reality. The Summary Plan Description, which is applicable to both Plans, has an all-encompassing term for both Plans, namely, "[t]he MITRE Corporation Retirement Program." The MITRE Corporation Retirement Program, Summary Plan Description, Effective January 1, 2020 ("SPD") at 1. The SPD goes on to confirm that the Plans had identical managers, recordkeepers, trustees and sponsors. SPD at 4.

18.     Plaintiff has standing to bring this action on behalf of the Plan because he participated in the Plan and was injured by Defendants' unlawful conduct.  Plaintiff is entitled to receive benefits in the amount of the difference between the value of his account currently, or as

of the time his account was distributed, and what his account are or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

19.    Plaintiff did not have knowledge of all material facts (including, among other things, total cost comparisons to similarly-sized plans) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

### Defendants

#### Company Defendant

20.    MITRE is the sponsor of the Plans and a named fiduciary of both the QRP Plan and the TSA Plan with a principal place of business being 202 Burlington Road, Bedford, Massachusetts.   The December 31, 2020 Form 5500 of the MITRE Corporation Qualified Retirement Plan filed with the United States Department of Labor ("2020 QRP Form 5500") at 1 and The December 31, 2020 Form 5500 of the MITRE Corporation Tax Sheltered Annuity Plan filed with the United States Department of Labor ("2020 TSA Form 5500") at 1. MITRE describes itself as a not-for-profit organization which works on the public interest across federal, state, and local governments, as well as industry and academia.[4] MITRE operates federally funded research and development centers ("FFRDC's"), which assist the United States government with scientific research and analysis, development, and acquisition, and has an independent research program. *Id.* MITRE has over 8,200 employees.

21.    MITRE appointed the Investment Advisory Committee of the MITRE Corporation ("Committee") to, among other things, ensure that the investments available to both Plans' participants are appropriate, had no more expense than reasonable and performed well as compared to their peers. 2020 QRP Auditor Report at 10 and the 2020 TSA Auditor Report at 9. As detailed

---

[4] See, https://www.mitre.org/about/corporate-overview last accessed on September 20, 2021.

in each respective Auditor Report, "[t]he Investment Advisory Committee determines the appropriateness of the Plan's investment offerings and monitors investment performance." *Id*. As will be discussed below, the Committee fell well short of these fiduciary goals. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

22.    Accordingly, MITRE during the putative Class Period is/was a fiduciary of the Plans, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because it had a duty to monitor the actions of the Committee.

23.    For the foregoing reasons, the Company is a fiduciary of the Plans, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

**Board Defendants**

24.    MITRE, acting through its Board of Trustees, appointed the Investment Advisory Committee of the MITRE Corporation ("Committee") to, among other things, ensure that the investments available to both Plans' participants are appropriate, had no more expense than reasonable and performed well as compared to their peers. 2020 QRP Auditor Report at 10 and the 2020 TSA Auditor Report at 9. As detailed in each respective Auditor Report, "[t]he Investment Advisory Committee determines the appropriateness of the Plan's investment offerings and monitors investment performance." *Id*. As will be discussed below, the Committee fell well short of these fiduciary goals. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

25.    Accordingly, each member of the Board during the putative Class Period (referred to herein as John Does 1-10) is/was a fiduciary of the Plans, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each had a duty to monitor the actions of the Committee.

26.     The Board and the unnamed members of the Board during the Class Period (referred to herein as John Does 1-10), are collectively referred to herein as the "Board Defendants."

**Committee Defendants**

27.     A discussed above, MITRE and the Board appointed the Committee to, among other things, ensure that the investments available to both Plans' participants are appropriate, had no more expense than reasonable and performed well as compared to their peers. 2020 QRP Auditor Report at 10 and the 2020 TSA Auditor Report at 9. As detailed in each respective Auditor Report, "[t]he Investment Advisory Committee determines the appropriateness of the Plan's investment offerings and monitors investment performance." *Id*. As will be discussed below, the Committee fell well short of these fiduciary goals. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

28.     The Committee and each of its members were fiduciaries of the Plans during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of the Plans assets.

29.     The Committee and unnamed members of the Committee during the Class Period (referred to herein as John Does 11-20), are collectively referred to herein as the "Committee Defendants."

**Additional John Doe Defendants**

30.     To the extent that there are additional officers, employees and/or contractors of MITRE who are/were fiduciaries of the Plans during the Class Period, or were hired as investment manager(s) for the Plans during the Class Period, the identities of whom are currently unknown to Plaintiff, Plaintiff reserves the right, once their identities are ascertained, to seek leave to join them to the instant action.  Thus, without limitation, unknown "John Doe" Defendants 21-30 include, but are not limited to, MITRE officers, employees and/or contractors who are/were fiduciaries of

8

the Plans within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period.

## IV.   CLASS ACTION ALLEGATIONS

31.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):[5]

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Plans, at any time between September 29, 2015 through the date of judgment (the "Class Period").

32.    The members of the Class are so numerous that joinder of all members is impractical.  The 2020 QRP Form 5500 lists 12,366 Plan "participants with account balances as of the end of the plan year."  2020 QRP Form 5500 at 2. The 2020 TSA Form 5500 lists 12,225 Plan "participants with account balances as of the end of the plan year."  2020 TSA Form 5500 at 2.

33.    Plaintiff's claims are typical of the claims of the members of the Class.  Like other Class members, Plaintiff participated in the Plans and has suffered injuries as a result of Defendants' mismanagement of the Plans. Defendants treated the Plaintiff consistently with other Class members and managed the Plans as a single entity. Plaintiff's claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

34.    There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:

---

[5] Plaintiff reserves the right to propose other or additional classes or subclasses in his motion for class certification or subsequent pleadings in this action.

A.      Whether Defendants are/were fiduciaries of the Plans;

B.      Whether Defendants breached their fiduciary duties of loyalty and prudence by engaging in the conduct described herein;

C.      Whether the Company and Board Defendants failed to adequately monitor the Committee and other fiduciaries to ensure the Plans were being managed in compliance with ERISA;

D.      The proper form of equitable and injunctive relief; and

E.      The proper measure of monetary relief.

35.     Plaintiff will fairly and adequately represent the Class and has retained counsel experienced and competent in the prosecution of ERISA class action litigation.  Plaintiff has no interests antagonistic to those of other members of the Class.  Plaintiff is committed to the vigorous prosecution of this action and anticipates no difficulty in the management of this litigation as a class action.

36.     This action may be properly certified under Rule 23(b)(1).  Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.  Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

37.     In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## V.      THE PLANS

38.      The Plans, collectively referred to as the "MITRE Retirement Program" in the SPD, are "defined contribution" plans within the meaning of ERISA Section 3(34), 29 U.S.C. §1002(34). The TSA is intended to qualify under Section 403(b) of the Internal Revenue Code, and the QRP is intended to qualify under Section 401(a) of the Internal Revenue Code. The Plans became effective on August 1, 1981 and are maintained by MITRE. Employees of MITRE (excluding co-op, seasonal, temporary, on-call, leased, and MITRE global employees) are eligible to participate in the Plans. SPD at 1.

39.      The Plans are "defined contribution" or "individual account" plans within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plans provide for individual accounts for each participant and for benefits based solely upon the amount contributed to those accounts, and any income, expense, gains and losses, and any forfeitures of accounts of the participants which may be allocated to such participant's account. The 2020 QRP Auditor Report at 10 and the 2020 TSA Auditor Report at 9.  Consequently, retirement benefits provided by the Plans are based solely on the amounts allocated to each individual's account.  *Id.*

*Eligibility*

40.      In general, regular full-time employees are eligible to participate in the Plans. *Id*.

*Contributions*

41.      There are several types of contributions that can be added to a participant's account, including: an employee salary deferral contribution, an employee Roth 401(k) contribution, an employee after-tax contribution, catch-up contributions for employees aged 50 and over, rollover contributions, discretionary profit-sharing contributions and employer matching contributions based on employee pre-tax, Roth 401(k), and employee after-tax contributions. *Id.*

42.      With regard to employee contributions in the TSA Plan: "participants may make contributions to the Plan subject to certain Internal Revenue Service ('IRS') limitations." 2020

11

TSA Auditor Report at 10. MITRE will make matching contributions to the TSA Plan on behalf of its employee based on a three-tier structure involving the total amount contributed by the employee. *Id.* Under the QRP Plan, employees are not required to make contributions but, instead, MITRE makes all contribution on their behalf. 2020 QRP Auditor Report at 10.

43.     Like other companies that sponsor 401(k) plans for their employees, MITRE enjoys both direct and indirect benefits by providing matching contributions to the Plans' participants. Employers are generally permitted to take tax deductions for their contributions to 401(k) plans at the time when the contributions are made. *See generally,* https://www.irs.gov/retirement-plans/plan-sponsor/401k-plan-overview.

44.     MITRE also benefits in other ways from the Plans' matching program.  It is well-known that "[o]ffering retirement plans can help in employers' efforts to attract new employees and reduce turnover." *See,* https://www.paychex.com/articles/employee-benefits/employer-matching-401k-benefits.

45.     Given the size of the Plans, MITRE likely enjoyed a significant tax and cost savings from offering a match.

***Vesting***

46.     With regard to contributions made by participants to the Plans: "…contributions are immediately vested." 2020 QRP Auditor Report at 11 and 2020 TSA Auditor Report at 10.

***The Plans' Investments***

47.     In theory, the Committee determines the appropriateness of the Plans' investment offerings and monitors investment performance. 2020 QRP Auditor Report at 10 and 2020 TSA Auditor Report at 9. As will be discussed in more detail below, the Committee fell well short of these fiduciary goals.

48.     Several funds were available to Plan participants for investment each year during the putative Class Period.  Specifically, a participant may direct all contributions to selected investments as made available and determined by the Committee.

49.     The QRP Plan's assets under management for all funds as of December 31, 2020 was $2,491,873,696.  2020 QRP Auditor Report at 8. The TSA Plan's assets under management for all funds as of December 31, 2020 was $4,545,351,415.  2020 TSA Auditor Report at 7.

**Payment of Plan Expenses**

50.     During the Class Period, administrative expenses were paid for using the Plans assets. As described in the 2020 Auditor Reports: "[m]anagement fees and record-keeping costs are paid by the Plan …"  2020 QRP Auditor Report at 12 and 2020 TSA Auditor Report at 12.

## VI.     THE PLANS' FEES DURING THE CLASS PERIOD WERE UNREASONABLE

### A.  The Totality of the Circumstances Demonstrates that the Plans' Fiduciaries Failed to Administer the Plans in a Prudent Manner

51.     As described in the "Parties" section above, Defendants were fiduciaries of the Plans.

52.     Plaintiff did not have and does not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plans, including Defendants' processes (and execution of such) for monitoring the Plans' fees, because this information is solely within the possession of Defendants prior to discovery.  *See Braden v. Wal-mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.") In fact, in an attempt to discover the details of the Plans' mis-management, on February 15, 2021, the Plaintiff wrote to MITRE requesting, *inter alia*, meeting minutes from the Committee. By Letter dated, April 1, 2021, MITRE denied Plaintiff's request for these meeting minutes.

53.     For purposes of this Complaint, Plaintiff has drawn reasonable inferences regarding Defendants' decision-making processes based upon the numerous factors set forth below.

54.     Defendants' breaches of their fiduciary duties, relating to their overall decision-making, resulted in, *inter alia*, the imposition of excessive administrative and record keeping fees which wasted the assets of the Plans and the assets of participants.

### B. Defendants Failed to Adequately Monitor the Plans' Administrative and Recordkeeping Expenses

55.     The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper."  Nearly all recordkeepers in the marketplace offer the same range of services and can provide the services at very little cost.  In fact, several of the services, such as managed account services, self-directed brokerage, Qualified Domestic Relations Order processing, and loan processing are often a profit center for recordkeepers.  Numerous recordkeepers in the marketplace are capable of providing a high level of service and will vigorously compete to win a recordkeeping contract for a jumbo defined contribution plan.

56.     Recordkeeping expenses can either be paid directly from plan assets, or indirectly by the plan's investments in a practice known as revenue sharing (or a combination of both or by a plan sponsor).  Revenue sharing payments are payments made by investments within the plan, typically mutual funds, to the plan's recordkeeper or to the plan directly, to compensate for recordkeeping and trustee services that the mutual fund company otherwise would have to provide.

57.     Although utilizing a revenue sharing approach is not *per se* imprudent, unchecked, it is devastating for plan participants (*e.g., see* allegations *infra*).  "At worst, revenue sharing is a way to hide fees.  Nobody sees the money change hands, and very few understand what the total investment expense pays for.  It's a way to milk large sums of money out of large plans by charging a percentage-based fee that never goes down (when plans are ignored or taken advantage of).  In

some cases, employers and employees believe the plan is 'free' when it is in fact expensive." Justin Pritchard, "Revenue Sharing and Invisible Fees" available at http://www.cccandc.com/p/revenue-sharing-and-invisible-fees (last visited January 17, 2021).

58.     Prior to the start of the Class Period on April 8, 2006, MITRE entered into a Record Keeping Services Agreement with the Teachers Insurance and Annuity Association of America ("TIAA") to provide recordkeeping services to the Plans.   Under the terms of the agreement, TIAA provides recordkeeping services based on a percentage of the assets in the Plans.    The annual revenue required for services was called the "Revenue Requirement."

59.     In 2015 the Revenue Requirement was 0.10 basis points of total Plan assets, in 2016 the percentage was .07 basis points of total assets and from 2018 through at least 2020, that percentage was .039 basis points.  The most recent amendment to the Record Keeping Services Agreement states the Revenue Requirement of .039%  "will remain in effect for a five (5) year period beginning July 1, 2018 (ending June 30, 2023)."  Amendment No. 11 to the Record Keeping Services Agreement.

60.     The cost of recordkeeping services depends on the number of participants (or participant accounts), not on the amount of assets in the participant's account.[6]  Thus, prudent fiduciaries negotiate a fixed dollar amount for the recordkeeper's annual compensation, usually based on a rate of a fixed dollar amount per participant.  Because of economies of scale, large plans get lower effective rates per participant than smaller plans.  Plans with 5,000 participants or more can obtain much lower rates per participant than a plan with 500 participants.

---

[6] "[T]he actual cost of administrative services is more dependent on the number of participants in the plan."  There is no "logical or practical correlation between an increase in administrative fees and an increase in plan assets."  Hewitt Associates, LLC, *Be a Responsible Fiduciary: Ask the Right Questions About 401(k) Plan Fees*, Oct. 2008; *see also* Mercer Investment Consulting, Inc., *DC Fee Management – Mitigating Fiduciary Risk and Maximizing Plan Performance* (2013), https://www.mercer.com/content/dam/mercer/

61.     Because recordkeeping costs are not affected by account size, prudent fiduciaries of defined contribution plans negotiate recordkeeping fees as a fixed dollar amount rather than as a percentage of assets. *See* Mercer Best Practices at 3.   Otherwise, as plan assets grow the recordkeeping compensation increases without any change in the recordkeeping services., leading to unreasonable fees.

62.     As demonstrated in the charts below, using a fixed percentage of assets to determine recordkeeping and administrative costs resulted in a worst-case scenario for the Plans' participants because it saddled the Plans' participants with above-market administrative and recordkeeping fees throughout the Class Period.   Notably, even though the Revenue Requirement decreased over the years it couldn't keep pace with the growth of Plan assets.

63.     The Plans' per participant administrative and recordkeeping fees were as follows:

| QRP PLAN PER PARTICIPANT RECORDKEEPING AND ADMINISTRATIVE COSTS | | | | | | |
|---|---|---|---|---|---|---|
| Year | 2020 | 2019 | 2018 | 2017 | 2016 | 2015 |
| Assets | $2.509B | $2.245B | $1.865B | $1.985B | $1.708B | $1.06B |
| Asset Based Fee | 0.039% | 0.039% | 0.039% | 0.07% | 0.10% | 0.10% |
| Total Fee | 978,734 | 876,874 | 727,402 | 1,389,940 | 1,708,185 | 1,603,891 |
| Participants | 12366 | 14426 | 12125 | 11145 | 10798 | 10603 |
| PP Cost | $79.15 | $60.78 | $59.99 | $124.71 | $158.19 | $151.27 |

| TSA PLAN PER PARTICIPANT RECORDKEEPING AND ADMINISTRATIVE COSTS | | | | | | |
|---|---|---|---|---|---|---|
| Year | 2020 | 2019 | 2018 | 2017 | 2016 | 2015 |
| Assets | $4.545B | $4.110B | $3.438B | $3.643B | $3.129B | $2.925B |
| Asset Based Fee | 0.039% | 0.039% | 0.039% | 0.07% | 0.10% | 0.10% |
| Total Fee | $1,772,687 | $1,603,107 | $1,341,156 | $2,550,577 | $3,129,448 | $2,925,944 |
| Participants | 12225 | 16933 | 16684 | 14336 | 14190 | 13952 |
| PP Cost | $145.01 | $94.67 | $80.39 | $177.91 | $220.54 | $209.72 |

64.     The above fees were astronomical when benchmarked against similar plans.

65.     During the Class Period, the combined Plans had a low of approximately 24,555 total participants in 2015 to a high of 31,359 total participants in 2019 making it eligible for some of the lowest fees on the market.

66.     Looking at recordkeeping costs for plans of a similar size in 2018 shows that the Plan was paying higher recordkeeping fees than its peers. The chart below analyzes a few well managed plans having no more than 24,000 participants and no more than $2.5 billion dollars in assets under management:

| Plan | Participants | Assets | Total RK Fee | RK Fee/PP |
|---|---|---|---|---|
| Sutter Health Retirement Income Plan | 13,248 | $406,000,195 | $460,727 | $35 |
| Fortive Retirement Savings Plan | 13,502 | $1,297,404,611 | $472,673 | $35 |
| DHL Retirement Savings Plan | 14,472 | $806,883,596 | $483,191 | $33 |
| Dollar General Corp 401(k) Plan | 16,125 | $355,768,325 | $516,000 | $32 |
| Sanofi U.S. Group Savings Plan | 24,097 | $5,522,720,874 | $558,527 | $23 |

Thus, the Plans, with over 31,000 participants and over $6 billion dollars in assets in 2019, should have been able to negotiate a recordkeeping cost in the low $30 range from the beginning of the Class Period to the present.

67.     Further, NEPC, a consulting group, recently conducted its 15th Annual Survey titled the NEPC 2020 Defined Contribution Progress Report, which took a survey of various defined contribution plan fees.[7] The sample size and respondents included 121 Defined Contribution Plans

---

[7] Available at
https://f.hubspotusercontent00.net/hubfs/2529352/2020%20DC%20Plan%20and%20Fee%20Survey/2020%20NEPC%20DC%20Plan%20Progress%20Report.pdf

broken up as follows: 71% Corporate; 20% Healthcare, and 9% Public, Not-for-Profit and other. The average plan had $1.1 billion in assets and 12,437 participants. *See* Report at 1.

68.     NEPC's survey found that the majority of plans with over 15,000 participants, to use a conservative number, paid slightly over $40 per participant recordkeeping, trust and custody fees.  Report at 10.  The worst performing plans reviewed by the NEPC with over 15,000 participants paid no more than $60 per participant, but clearly MITRE should have been able to negotiate a fee well below this mark. *Id.*

69.     Further, the Plan's total recordkeeping costs are clearly unreasonable as some authorities have recognized that reasonable rates for jumbo plans typically average around $35 per participant, with costs coming down every day.[8]

70.     In order to make an informed evaluation as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a plan, a prudent fiduciary must identify all fees, including direct compensation and revenue sharing being paid to the plan's recordkeeper.  To the extent that a plan's investments pay asset-based revenue sharing to the recordkeeper, prudent fiduciaries monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels, and require that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants.

---

[8] Case law is in accord that large plans can bargain for low recordkeeping fees.  *See*, *e.g.*, *Spano v. Boeing*, Case 06-743, Doc. 466, at 26 (S.D. Ill. Dec. 30, 2014) (plaintiffs' expert opined market rate of $37–$42, supported by defendants' consultant's stated market rate of $30.42–$45.42 and defendant obtaining fees of $32 after the class period); *Spano*, Doc. 562-2 (Jan 29, 2016) (declaration that Boeing's 401(k) plan recordkeeping fees have been $18 per participant for the past two years); *George*, 641 F.3d at 798 (plaintiffs' expert opined market rate of $20–$27 and plan paid record-keeper $43–$65); *Gordon v. Mass Mutual*, Case 13-30184, Doc. 107-2 at ¶10.4 (D.Mass. June 15, 2016) (401(k) fee settlement committing the Plan to pay not more than $35 per participant for recordkeeping).

71.     A plan's fiduciaries must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available. This will generally include conducting a Request for Proposal ("RFP") process at reasonable intervals, and immediately if the plan's recordkeeping expenses have grown significantly or appear high in relation to the general marketplace.  More specifically, an RFP should happen at least every three to five years as a matter of course, and more frequently if the plans experience an increase in recordkeeping costs or fee benchmarking reveals the recordkeeper's compensation to exceed levels found in other, similar plans. *George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 800 (7th Cir. 2011); *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 479 (M.D.N.C. 2015); *see also* NEPC 2020 Defined Contribution Progress Report at 10 ("Best Practice is to compare fees and services through a record keeping vendor search Request for Proposal process).

72.     The fact that the Plans have stayed with the same recordkeeper, namely TIAA since 2006, paid an increasing amount in recordkeeping fees from 2018 to the present, and paid outrageous amounts for recordkeeping from 2015 to 2017 (nearly **5x** the amount similarly-situated plans paid), there is little to suggest that Defendants conducted a RFP at reasonable intervals – or certainly at any time prior to 2015 through the present - to determine whether the Plans could obtain better recordkeeping and administrative fee pricing from other service providers given that the market for recordkeeping is highly competitive, with many vendors equally capable of providing a high-level service.

73.     Given the size of the Plans' assets during the Class Period and total number of participants, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, the Plans could have obtained recordkeeping services that were comparable to or superior to the typical services provided by the Plans' recordkeeper at a lower cost.

### C. Utilizing Higher Cost Share Classes of Identical Funds to Pay for Recordkeeping Was Imprudent

74.     Another indication of Defendants' flawed Plan expense monitoring process resulted in the failure to identify and utilize available lower-cost share classes of many of the funds in the Plans during the Class Period.

75.     Pursuant to the Record Keeping Agreement, "Where the Employer with respect to a Plan maintains a balance in and makes active contributions to any of the mutual funds, other investment vehicles, and/or TIAA-CREF annuity contracts recordkept on TIAA's platform, TIAA will compare the Revenue Requirement to the revenue generated by such Plan on a quarterly basis to determine if the Plan generated sufficient revenue to meet TIAA's Revenue Requirement." Record Keeping Services Agreement, Amendment No. 11 at 1. Excess amounts were placed in a Revenue Credit Account, except if the excess amount was "less than $2,500" for any given year. *Id.* at 2.

76.     Here, using revenue sharing to pay for over-priced Recordkeeping services cost participants out-of-pocket money which compounded over time leaving participants with significantly less for their retirement. First, they suffered lost opportunity costs with regard to the money that was in excess of the Revenue Requirement. Second, they lost opportunity costs with regard to the overpriced Revenue Requirement.

77.     "Wasting beneficiaries' money is imprudent. In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs." Uniform Prudent Investor Act (the "UPIA"), § 7. "Beneficiaries subject to higher fees … lose not only money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble II*, 843 F.3d at 1198.

78.     During the Class Period, MITRE maintained many funds in the Plans which had significant expense ratios above a standard fund management fee.  This excess expense is the aforementioned revenue sharing.

79.     As an example of one of these funds in the Plans, in 2021, the Plans offered the Cohen and Steers Real Estate Securities A which has a published expense ratio of 1.12%. The "A" at the end of this fund indicates it's the retail version of the fund. The Plans which had more than $7 billion dollars in assets under management in 2021, should have been able to easily qualify for the institutional share of this particular fund. The institutional version is known as the Cohen and Steers Real Estate Securities I and has an expense ratio of only 0.86%. The difference between the 1.12% expense ratio of the A Class and the 0.86% expense ratio of the I Class is considered revenue sharing and is what MITRE used to pay its excessive recordkeeping costs.

80.     Additionally, it would appear that the MITRE did the opposite of what's required of a prudent fiduciary. Instead of seeking to lower the amount of revenue sharing in the Plans, MITRE instead increased it to cover the already excessively high asset based administrative and recordkeeping fees. To provide just one example, in 2020, the Plans moved from the institutional classes of the Fidelity Freedom Index target date funds having an expense ratio of only 0.12% to a much more expensive line up of target date funds which paid additional revenue sharing so the Plans could afford the excessively high asset based administrative and recordkeeping fees. In particular, in 2021, the Plans moved to the retail versions of Fidelity target date funds, which cost plan participants an additional expense of between .20% and .25%.  The Defendants should have sought to reduce the overall recordkeeping and administrative expense rather than seek to increase the Plans' revenue sharing to pay for it.

81.     Because Plan participants were paying more for recordkeeping than they should have as a result of the Plan fiduciaries' conduct, this confirms that the use of higher-cost share classes cannot be justified as a prudent means to pay recordkeeping and administrative costs via

revenue sharing.  The selection of higher-cost share classes such as the ones identified in the paragraph above was thus imprudent.

82.     The use of higher cost share classes of Plan funds caused millions of dollars of damages for the Plan and its participants.

**FIRST CLAIM FOR RELIEF**
**Breach of Fiduciary Duty of Prudence**
**(Asserted against the Committee)**

83.     Plaintiff re-alleges and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

84.     At all relevant times, the Committee and its members during the Class Period ("Prudence Defendants") were fiduciaries of the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plans or disposition of the Plans' assets.

85.     As fiduciaries of the Plans, these Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a).  These fiduciary duties included managing the assets of the Plans for the sole and exclusive benefit of the Plans' participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

86.     The Prudence Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint. The Prudence Defendants selected and retained investment options in the Plans despite the high cost of the funds in relation to other comparable investments. The Prudence Defendants also failed to investigate the availability of lower-cost share classes of certain mutual funds in the Plans.

87.     As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans suffered millions of dollars of losses due to excessive costs and lower net investment

returns. Had Defendants complied with their fiduciary obligations, the Plans would not have suffered these losses, and the Plans' participants would have had more money available to them for their retirement.

88.     Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence Defendants are liable to restore to the Plans all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches. In addition, Plaintiff is entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

89.     The Prudence Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

### SECOND CLAIM FOR RELIEF
**Failure to Adequately Monitor Other Fiduciaries**
**(Asserted against MITRE and the Board Defendants)**

90.     Plaintiff re-alleges and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

91.     MITRE and the Board (the "Monitoring Defendants") had the authority to appoint and remove members of the Committee, and the duty to monitor the Committee and were aware that the Committee Defendants had critical responsibilities as fiduciaries of the Plans.

92.     In light of this authority, the Monitoring Defendants had a duty to monitor the Committee Defendants to ensure that the Committee Defendants were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plans in the event that the Committee Defendants were not fulfilling those duties.

93.     The Monitoring Defendants also had a duty to ensure that the Committee Defendants possessed the needed qualifications and experience to carry out their duties; had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plans' investments; and reported regularly to the Monitoring Defendants.

94.     The Monitoring Defendants breached their fiduciary monitoring duties by, among other things:

> (a)     Failing to monitor and evaluate the performance of the Committee Defendants or have a system in place for doing so, standing idly by as the Plans suffered significant losses as a result of the Committee Defendants' imprudent actions and omissions;

> (b)     failing to monitor the processes by which Plans investments were evaluated, their failure to investigate the availability of lower-cost share classes; and

> (c)     failing to remove Committee members whose performance was inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plans, all to the detriment of the Plans and Plans' participants' retirement savings.

95.     As a consequence of the foregoing breaches of the duty to monitor, the Plans suffered millions of dollars of losses.  Had the Monitoring Defendants complied with their fiduciary obligations, the Plans would not have suffered these losses, and the Plans' participants would have had more money available to them for their retirement.

96.     Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Monitoring Defendants are liable to restore to the Plans all losses caused by their failure to adequately monitor the Committee Defendants.  In addition, Plaintiff is entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

## <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, Plaintiff prays that judgment be entered against Defendants on all claims and requests that the Court awards the following relief:

A.    A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B.    Designation of Plaintiff as a Class Representatives and designation of Plaintiff's counsel as Class Counsel;

C.    A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

D.    An Order compelling the Defendants to make good to the Plans all losses to the Plans resulting from Defendants' breaches of their fiduciary duties, including losses to the Plans resulting from imprudent investment of the Plans' assets, and to restore to the Plans all profits the Defendants made through use of the Plans' assets, and to restore to the Plans all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.    An order requiring the Defendants to disgorge all profits received from, or in respect of, the Plans, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against the Defendants as necessary to effectuate said relief, and to prevent the Defendants' unjust enrichment;

F.    Actual damages in the amount of any losses the Plans suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.      An order enjoining Defendants from any further violations of their

ERISA fiduciary responsibilities, obligations, and duties;

H.      Other equitable relief to redress Defendants' illegal practices and

to enforce the provisions of ERISA as may be appropriate, including appointment

of an independent fiduciary or fiduciaries to run the Plans and removal of Plans'

fiduciaries deemed to have breached their fiduciary duties;

I.      An award of pre-judgment interest;

J.      An award of costs pursuant to 29 U.S.C. § 1132(g);

K.      An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and

the common fund doctrine; and

L.      Such other and further relief as the Court deems equitable and just.


Date: September 29, 2021          **THE LAW OFFICES OF JEFFREY HELLMAN, LLC**

/s/ Jeffrey Hellman            .
Jeffrey Hellman, Esquire
BBO # 549896
195 Church Street, 10th Floor
New Haven, CT 06510
jeff@jeffhellmanlaw.com
(203) 691-8762
Fax: (203) 823-4401
Local Rule 83.1(c) Counsel

**CAPOZZI ADLER, P.C.**

*/s/ Donald R. Reavey*
Donald R. Reavey, Esquire
PA Attorney ID #82498
(*Pro Hac Admission to be Requested*)
2933 North Front Street
Harrisburg, PA 17110
donr@capozziadler.com
(717) 233-4101
Fax (717) 233-4103

*/s/ Mark K. Gyandoh*
Mark K. Gyandoh, Esquire
PA Attorney ID # 88587
(*Pro Hac Admission to be Requested)*
Gabrielle Kelerchian, Esquire
(*Pro Hac Admission to be Requested*)
**CAPOZZI ADLER, P.C.**
 312 Old Lancaster Road
 Merion Station, PA 19066
 markg@capozziadler.com
 gabriellek@capozziadler.com
 (610) 890-0200
 Fax (717) 233-4103

Counsel for Plaintiff and the Putative Class